# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBIN HEWITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 04 C 2210 |
| v. ) | Honorable Joan B. Gottschall |
| ) | |
| ) | |
| UNITED STATES OFFICE OF ) | |
| PERSONNEL MANAGEMENT, ) | |
| an agency of the United States ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case requests review of the Office of Personnel Management's ("OPM") affirmance of Blue Cross Blue Shield of Illinois' ("BCBSI") decision to terminate coverage of Robin Hewitt's ("Hewitt") home nursing benefits. Before the court are Hewitt's and OPM's cross motions for summary judgment: Hewitt's requesting that the court overturn OPM's approval of BCBSI's denial of benefits, and OPM's seeking affirmance of its decision to approve the denial of benefits. For the reasons stated below Hewitt's motion for summary judgement is granted and OPM's is denied.

**Standard of Review**

Hewitt requests review of OPM's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §706, and §504 of the Rehabilitation Act, 29 U.S.C. §794. In accordance with the APA, the court bases its review in this case on the administrative record, which consists of the documents before the OPM in making its decision. 5 U.S.C. §706.

The APA defines the scope of review with respect to both legal and factual determinations

1

made by the OPM: "[t]he reviewing court shall – . . . (2) hold unlawful and set aside agency action, findings and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706. Even under the APA's arbitrary and capricious standard of review, with respect to factual determinations, the court's inquiry is still to be "searching and careful." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

We will grant a summary judgment motion if the record reveals that there is no genuine issue of triable fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To succeed here, Hewitt must show from evidence in the administrative record that OPM acted arbitrarily and/or capriciously in affirming BCBSI's withdrawal of his home nursing benefits. For OPM to succeed, it must show that it acted within the bounds of its discretion.

**Background of BCBSI's Denial of Benefits**

Hewitt is a 41 year old severely disabled man, who suffers from congenital muscular distrophy, respiratory and congestive heart failure, and other chronic conditions such as scoliosis and significant contractures. (R22, 258). Hewitt has a tracheostomy, allowing him to breath through the use of a mechanical respirator. He is dependent on the respirator for all of his breathing. Since the late 1980's, Hewitt has been kept alive by the respirator and other forms of medical care that he receives 24 hours per day in his home. As he has aged, his condition has not improved, and his attending physician expects it to worsen. Almost all of the medical information in the record attests to Hewitt's need for full-time skilled nursing services to operate and maintain Hewitt's respirator, continually monitor his critical life-support signals, and take immediate remedial action to correct the problems that arise with some frequency in keeping his airway clear and otherwise responding to Hewitt's sudden acute health needs.

Hewitt is a beneficiary of the Blue Cross Blue Shield Service Benefit Plan ("Plan"), which is a health plan issued by BCBSI pursuant to a contract with OPM to provide insurance in accordance with the Federal Employees Health Benefits Act ("FEHBA") 5 U.S.C. §8901 *et seq.* The Plan provides for unlimited hospitalization for medically necessary conditions, but does not entitle Plan members to the extent of in-home skilled nursing that Hewitt has received. Despite this, between 1989 and early 2001, under the Plan's flexible benefits provision, BCBSI continuously covered Hewitt's 24-hour skilled in-home nursing services. This flexible benefits provision allows BCBSI the discretion to provide alternative, less costly care (here, in-home nursing) in lieu of otherwise covered benefits (here, hospitalization). (R1237.) In-home service was provided because it was judged by BCBSI and Hewitt to be preferable to hospitalization for both quality of care and cost reasons. Approximately once per year, BCBSI sent Hewitt an "Authorization for Alternative Benefits Letter" stating this. (*See, e.g.* R1409.) On May 24, 2001, BCBSI notified Hewitt that it was scaling back its coverage of his in-home nursing services to 16 hours per day.[1] Hewitt protested, and on August 23, 2001, he heard from BCBSI was that it would no longer cover his in-home nursing at all because such care was "maintenance and/or custodial," and was thus explicitly disallowed under the Plan (except for a limited number of short-duration nursing visits per year). (R1436.) In this letter, BCBSI did not explicitly claim that hospitalization was no longer medically necessary for Hewitt.

In response to this withdrawal of benefits, on November 13, 2001, Hewitt requested that BCBSI reconsider its decision and provided evidence to BCBSI establishing both that he still

---

[1] At the time the parties' summary judgment motions were briefed, Hewitt's remaining 8 hours per day of skilled nursing care were being paid for by a program administered by the State of Illinois.

required an acute or hospitalization level of care, and that the in-home care he was receiving met that need. (R1437-38). This evidence included detailed letter opinions from Hewitt's primary physician, Dr. Terry LaBarre, and Mary Granias, R.N., one of Hewitt's nurses. (R22-25, 26-28.) BCBSI undertook to consider Hewitt's request for reconsideration and as part of its review process it commissioned two "peer review analyses." These anlyses were conducted specifically to obtain opinions as to whether the services provided to Hewitt could instead be provided by nonprofessional or lay caregivers. (R238, 241.) The first was provided on December 11, 2001 by Dr. John Casebolt, and concluded that "[t]he policy and definitions[2] of BlueCross of Illinois have been noted and reviewed. In sum, I do not feel that decreasing the home skilled nursing care or transferring duties to other visiting care givers are an option in this case." (R242.) The second, provided on February 21, 2002 by Dr. Robert Brown, concluded the opposite, that "an able, willing, non-professional or lay caregiver can be trained to provide all of the services being rendered to the patient at his home," although Dr. Brown's report acknowledges that "[d]uring the period under review, the patient was particularly stable." (R238.) After this, BCBSI affirmed its earlier decision to withdraw Hewitt's in-home nursing benefits, without detailed explanation -- BCBSI's letter to Hewitt of March 1, 2002 denying Hewitt's appeal mentions only that "[t]he determination process has included several levels of internal review by different BlueCross BlueShield of Illinois medical directors. The final level of review was completed by an independent external review organization. . . . The independent external review concluded that the services currently provided are custodial." (R235.)

The March 1 denial letter informed Hewitt that BCBSI would stop paying for Hewitt's

---

[2] The Plan defines "custodial services" as "[t]reatment or services, regardless of who recommends them or where they are provided, that a person not medically skilled could perform safely and reasonably, or that mainly assist the patient with daily living activities . . ." (R297.)

4

nursing care on May 15, 2002, but during subsequent discussions with Hewitt's family, BCBSI put off its withdrawal of benefits until November 1, 2003, as related in BCBSI's letter of September 26, 2003. (R1461.) The September 26 letter reaffirmed that Hewitt's nursing benefits had been withdrawn because they were custodial, advised Hewitt of his right to seek review of BCBSI's final determination with OPM as to any contractual benefit to which Hewitt felt he was entitled, but also advised Hewitt that "the discontinuation of the private duty flexible benefit may not be disputed with OPM." (R1461-62.) As with its earlier justifications for withdrawing Hewitt's in-home care, BCBSI's August 23, 2001 letter to Hewitt states that "[t]he services provided are maintenance and/or custodial . . . the home care services currently provided do not require the continuous clinical assessment of a licensed nurse." (R1436.)

BCBSI's redefinition of Hewitt's care as "custodial" amounts to a denial of contractual benefits under the Plan. Hospitalization is covered by the Plan for unlimited days, but not if the treatment to be received at the hospital is for "custodial care." (Plan §5(c), R1210.) This means that by redefining Hewitt's needs as being satisfied by custodial care, even if Hewitt were admitted to the hospital to receive his current care, BCBSI would refuse coverage. This is a "back-door" denial of Hewitt's hospitalization benefits without a finding that his need for hospitalization is no longer medically necessary.

BCBSI had only the slimmest basis on which to justify its determination that Hewitt no longer qualified for hospitalization. Since at least 1998, BCBSI had each year approved Hewitt's in-home services as a replacement for covered hospitalization services.[3] According to the

---

[3] Hewitt has provided documentation establishing this fact for the years 1998, 1999 and 2000, but not for prior years. (R1401-18.) Hewitt alleges that BCBSI approved benefits in a like manner for the years 1989-1997, and OPM neither confirms nor denies this.

administrative record, BCBSI did not have evidence that anything had changed in Hewitt's condition to indicate that Hewitt's medical needs are any less severe than before. In fact, according to Hewitt's primary physician's report, Hewitt's condition is worsening if anything. (R23.) BCBSI did not challenge the fact that Hewitt's needs are as severe as ever. In fact, as late as February 24, 2004, BCBSI provided written acknowledgment to Hewitt that his skilled nursing services were "medically necessary." (R1483.) Despite this, BCBSI's August 23 letter and subsequent correspondence simply refuse to provide services which were previously (and contemporaneously) admitted by BCBSI to be medically necessary, relying on the single February 21, 2002 opinion by Dr. Brown that Hewitt's care could be provided by lay caregivers to outweigh the determinations of Hewitt's doctor and nurse, as well as BCBSI's other medical consultant.

BCBSI's final denial of coverage is subject to OPM review under the FEHB. 5 C.F.R. §890.105(e).

**OPM Review**

After receiving BCBSI's final denial, Hewitt filed his request for review with OPM on October 27, 2003. OPM's November 13, 2003 letter in response to Hewitt's request for review amounts to doublespeak - first OPM claims that it will not review Hewitt's claim at all because BCBSI told OPM not to: "[w]e contacted his Plan and were informed that the Plan has been providing benefits for additional home nursing visits under its 'flexible benefits' provision . . . the decision to offer or withdraw alternative, extracontractual benefits is solely within the Plan's discretion and may not be reviewed by OPM . . . ." In other words, with no independent review of the nature of the benefits offered, based on BCBSI's (the entity which OPM was charged with overseeing) characterization of those benefits, OPM took BCBSI's advice that it should decline

6

review. In the same letter, however, OPM second-guesses its decision not to review Hewitt's claim, "our review would have determined . . . [t]here is no contractual basis on which to compel the Plan to provide benefits for additional home nursing care visits in 2003." (R.1476-77.) Finally, the OPM's letter states that it could not make a determination as to the propriety of BCBSI's redefinition of Hewitt's care as custodial without further information regarding Hewitt's health history.

Hewitt supplied the health information requested, and using Hewitt's now-supplemented health record, OPM commissioned a review of BCBSI's determination that the services Hewitt was receiving were custodial from its independent medical consultant, Dr. Mark Frampton. Dr. Frampton's review contradicted BCBSI's final determination, stating that "the home nursing services as of 11/1/03 were not primarily custodial in nature," and "the member requires 24-hours of medically necessary skilled nursing services due to his condition."[4] (R290.) Despite this report, on February 26, 2004 OPM denied Hewitt's request to order BCBSI to continue his in-home nursing benefits, stating that it had "fulfilled its role" of providing independent medical assessment of the matter, but reaffirmed that the Plan reserved discretion to BCBSI to withhold flexible benefits. (R1479.)

Hewitt's family requested clarification of OPM's decision, and in response on May 5, 2004 OPM issued a supplemental letter describing the reasons for its final assessment that the Plan did

---

[4] A longer excerpt from Dr. Frampton's report reveals more fully its unequivocal nature: "This patient requires 24-hour skilled services in order to ventilate his airway. Having this service at home has probably prevented hospitalization during respiratory infections. The suctioning needs, tracheostomy care, and managing of the ventilator could not reasonably be met at a custodial level. The patient's life would be at risk without the availability of 24-hour skilled services, for even a few hours. If the patient is unable to receive these services at home, he will most likely need to enter a skilled nursing facility that manages ventilator dependent patients." (R290.)

not provide a benefit covering 24-hour skilled nursing services. (R1486.) Among other things, it states "[y]our BCBS Plan previously determined that hospitalization was medically necessary for your son," and provided in-home services in lieu of hospitalization. It continues "[w]hen the Plan decided to withdraw 24- hour skilled home nursing for your son, it did so because it determined that the services being provided were maintenance and/or custodial, and therefore not covered by any contract benefit." It concludes, without discussion, that "your son's current medical needs no longer require hospitalization. As a result, there is no longer any basis for your son to receive 24-hour skilled home nursing as a flexible benefit in lieu of hospitalization." (R1487.)

These statements by OPM include no discussion or rationale for summarily affirming BCBSI's back-door determination that Hewitt no longer was eligible for hospitalization benefits. In fact, OPM's final determination directly contradicts OPM's own internal medical analysis (Dr. Frampton's report), which affirmed Hewitt's need for 24-hour skilled nursing services and hence a level of care that had variously been described by BCBSI's prior correspondence approving Hewitt's benefits as "hospital" or "acute." OPM further confuses the issue by noting that its consultant had stated that Hewitt could receive the care he needs in a "skilled nursing facility," and seemingly concluded on the basis of this single statement that Hewitt's "medical needs no longer require hospitalization." (R1487.) A downgrade in the hospitalization benefits due Hewitt under the Plan is a withholding of a contractual benefit that is subject to the OPM's review. OPM's decision that Hewitt was not eligible for hospitalization benefits is not supported by any information in the record, and thus OPM's decision has no rational basis in the facts before it. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (to be upheld, agency must articulate a "rational connection between the facts found and the choice made") (citing *Burlington Truck Lines*

8

*v. United States*, 371 U.S. 156, 168 (1962)). The court holds that OPM acted arbitrarily and capriciously in affirming BCBSI's denial of hospitalization benefits to Hewitt.

**Rehabilitation Act Claim**

Hewitt also claims that OPM's affirmance of BCBSI's withdrawal of home nursing services violates §504 of the Rehabilitation Act, 29 U.S.C. §794. Hewitt claims that, in light of his continuing entitlement to hospitalization benefits, the "integration mandate" of the Rehabilitation Act, found in found in 5 C.F.R. §723.130(d), obligates BCBSI to continue to allow him to receive services at home like those he would receive in a hospital setting.

As an initial matter, OPM claims that, despite his exhaustion of BCBSI's and OPM's denial-of-benefits administrative review process, Hewitt must also exhaust the Rehabilitation Act's administrative hearing and appeal procedures found in 5 C.F.R. §723.10 before he can bring his case before the court. This assertion is incorrect. Cases, like Hewitt's, based on §504 (as opposed to §501) of the Rehabilitation Act may proceed directly to court, free of any requirement to exhaust administrative review. *Wagner v. Ill. Dep't of Pub. Aid*, No. 98 C 7268, 2004 U.S. Dist. LEXIS 22562, *18 (N.D. Ill. Oct. 29, 2004); *Freed v. CONRAIL*, 201 F.3d 188, 192-194 (3rd Cir. 2000); *McGeshick v. Principi*, 357 F.3d 1146, 1149 (10th Cir. 2004). Section 504 of the Rehabilitation Act utilizes the remedies, procedures and rights applicable to Title VI of the Civil Rights Act of 1964, and nothing in the language of Title VI or §504 requires exhaustion. *See* 29 U.S.C. § 794a(a)(2). OPM's citation of cases involving employment claims under the Rehabilitation Act are inapposite because the Rehabilitation Act carves out a special exhaustion requirement for §504 claims involving employment. *See* 5 C.F.R. § 723.170(b).

Regarding the merits of Hewitt's claim, the Rehabilitation Act prohibits discrimination

against disabled individuals by any executive agency, in any program conducted by the agency or through contractual arrangements. 29 U.S.C. § 794(a)[5]; 5 C.F.R. §723.130(a), (b). The Rehabilitation Act's implementing regulations contain an "integration mandate," requiring that the OPM administer its programs and activities "in the most integrated setting appropriate to the needs of qualified individuals with handicaps." 5 C.F.R. §723.130(d). The "most integrated setting appropriate" is in turn defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p.450. Nevertheless, if the OPM were to show that compliance with the mandate would result in a "fundamental alteration in the nature of a program or activity or in undue financial or administrative burdens," it could escape compliance. 5 C.F.R. §723.150(3). The integration mandate (and other Rehabilitation Act provisions and regulations) is mirrored in the American with Disabilities Act("ADA") to such an extent that the Rehabilitation Act's and ADA's corresponding provisions are governed by the same considerations and court rulings. *Radaszewski v. Maram*, 383 F.3d 599, 608 (7th Cir. 2004).

The pivotal case construing these provisions is *Olmstead v. L.C.*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court construed the ADA's integration mandate to preclude the "unjustified institutional isolation" of disabled individuals as unallowable disability-based discrimination. *Id*. at 597-603. Under *Olmstead*, the government entity being sued will be obligated to provide community integration for disabled individuals in their treatment where treating professionals find that such treatment is appropriate, the affected individuals do not oppose community-based

---

[5] 29 U.S.C. § 794(a) provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

10

treatment, and placement in the community can be reasonably accommodated in light of governmental resources and the needs of others with similar disabilities. *Id.* at 607; *Radaszewski*, 338 F.3d at 608.

In *Radaszewski,* the plaintiff's main claim was almost identical to Hewitt's, that "Illinois's unwillingness to continue funding private-duty nursing care for [plaintiff] at home portends precisely the type of 'unjustified institutional isolation' for him that *Olmstead* described as a form of discrimination prohibited by the ADA."[6] Like Hewitt, Radaszewski was receiving 24-hour in-home nursing care. The *Radaszewski* court found that if the plaintiff could show that the actual services he was to receive in an institutional setting "add up to the equivalent of around-the-clock, private-duty nursing care" that the plaintiff required, he would be entitled to receive that same care at home under the integration mandate. *Radaszewski,* 338 F.3d at 611. Other courts have agreed that entities subject to the integration mandate may not escape regulation simply by characterizing care they are obligated to provide as available only in a certain setting or location. *See Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) (nursing home services must be provided in home-care setting); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182-83 (10th Cir. 2003).

OPM does not dispute this description of the integration mandate. In fact, OPM cites it in its own briefing – OPM's Cross-Motion for Summary Judgement agrees that "the integration mandate addresses *where* a public entity may provide certain benefits that it has decided to cover, but not *whether* it must cover these benefits in the first place." *Id.* at 14 (emphasis in original). Furthermore, while OPM briefly mentions the "fundamental alteration" defense of 5 C.F.R. §723.150(a)(3), it does not pursue this defense, likely because requiring BCBSI to pay benefits to

---

[6] The court notes that *Radaszewski* was issued after briefing was completed in this case.

a nursing care provider instead of a hospital could not reasonably be construed as a fundamental alteration of services BCBSI is already providing. Instead, OPM bases its argument on its assertion that because Hewitt is not entitled to hospitalization services, BCBSI cannot be forced to provide these benefits either in his home or anywhere else. As discussed above, the court rejects this contention, and OPM's argument fails with it.

With respect to the *Olmstead* factors, it is clear that Hewitt not only does not oppose community integration, but has brought this suit seeking it. It is also clear that home care is appropriate for Hewitt - he has been receiving in-home nursing since at least 1989, and the record amply supports Hewitt's contention that this care has been high-quality, perhaps optimal. The last factor concerns whether placement in the community can be reasonably accommodated in light of governmental resources and the needs of others with similar disabilities. Hewitt asserts that the cost of Hewitt's in-home care is actually less than comparable care delivered in a hospital setting, and that this determines that providing Hewitt his in-home nursing is a reasonable accommodation by OPM and BCBSI. In support, Hewitt points out that OPM has admitted that "BCBSI authorized payment for plaintiff's home nursing as a beneficial and cost effective alternative to the skilled hospital level of care plaintiff required and which the Plan covered." (Ans. Compl. ¶22.) This admission demonstrates that OPM has accepted BCBSI's earlier admissions that in-home care was a cost-effective alternative to providing Hewitt's hospitalization benefits.

For the reasons stated above, Hewitt's motion for summary judgement is granted and OPM's denied.  OPM is directed to direct BCBSI to pay Hewitt's in-home nursing benefits. 5 C.F.R. §890.107(c) (remedy for erroneous OPM review of denial of benefits claim is order directing OPM to require carrier to pay disputed benefits).

Date: March 11, 2005                                    ENTER:

                                                        __/s/_____
                                                        Joan B. Gottschall
                                                        United States District Judge